1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOSE GUTIERREZ,                          No.  2:13-cv-1972 GEB AC

12              Petitioner,

13        v.                                  FINDINGS AND RECOMMENDATIONS

14   F. FOULK, Warden,

15              Respondent.

16

17        Petitioner is a California state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition filed on

19   September 15, 2013,[1] ECF No. 1, which challenges petitioner's 2010 conviction for first degree

20   murder and related offenses.  Respondent has answered, ECF No. 15, and petitioner has filed a

21   traverse, ECF No. 26.

22                              BACKGROUND

23   I.     Proceedings In the Trial Court

24        Petitioner and his co-defendant Jose Perez were charged in San Joaquin County with the

25   gang-related murder of Vincente Salazar.  The evidence at trial established the following facts.

26        On the night of August 14, 2009, Salazar and three female friends, all teenagers, were

27

28   _____

[1] See Houston v. Lack, 487 U.S. 266 (1988) (establishing rule that a prisoner's court document is
deemed filed on the date the prisoner delivered the document to prison officials for mailing).

walking home from a party when a car stopped near them.  Salazar was wearing a red shirt; red is the color of the Norteños.  Two men got out of the car, said "Southside" and "sur trece" and gestured with their hands, which the girls understood to mean that the men were gang members who "banged blue," i.e., were affiliated with the Sureños.  The men were later identified as Perez and Eduardo Montes, petitioner's uncle.[2]  A teenaged passenger in the car, Leticia P., identified petitioner as the driver.

Perez began beating and choking Salazar, and then Montes started swinging at Salazar with a crowbar.  Salazar eventually got control of the crowbar and used it to smash the windshield of the men's car.  Still inside the vehicle, petitioner pulled a gun out of his pocket.  Perez and Montes told petitioner to open the trunk, and when he released the latch they took out a gun.  Salazar started running away.  Petitioner, who was now standing next to the car, fired his gun at Salazar multiple times.  Perez fired his gun at Salazar as well.  Salazar fell to the ground.  Petitioner tracked Salazar with his gun, lowering his hand and firing his last shot at Salazar while Salazar was falling down.  Petitioner, Perez, Montes, and Leticia P. then all drove away together.

Police heard gunshots and drove to the intersection where Salazar had been shot.  Salazar was lying on the ground, unresponsive.  He was pronounced dead from a gunshot wound to his neck and head that entered from behind.  Salazar had also sustained blunt force trauma to his head, face, neck, trunk, and upper and lower extremities.

Police interviewed Leticia P.  During the interview, Leticia asked the police detective, "If I tell you my story, am I still going to go to jail?" The detective responded, "I'll tell you what, if you don't tell me anything, you're certainly going to go to jail." Leticia P. talked to the detective.  She did not go to jail.

Police also interviewed petitioner.  During the interview, petitioner admitted that he was in the car but denied being the shooter.

Police searched petitioner's house and found boxes of bullets in his bedroom.  On his cell phone was a picture of a gun on a blue bandana, which Leticia P. identified as being a photograph

---

[2]  Montes could not be located by law enforcement, and therefore was not prosecuted with petitioner and Perez.

of the murder weapon.  Police also searched Perez's home.  Inside his bedroom was a CD case with the writing "Sur 13," a disassembled .22-caliber rifle, a safe with a revolver inside, and bullets.  Perez's cell phone had rap music referring to Sureños shooting and killing Norteños.  Perez admitted he was a Sureño gang member.  He had gang tattoos on his chest, arm, and wrist.

Leticia P. testified that she, Perez and Montes were all members of local gangs affiliated with the Sureños, and that petitioner was not a gang member but was trying to be.  On the night of the homicide they had pulled over when they saw Salazar on the sidewalk, because he was wearing a red shirt.  A gang expert, Mike Rodriguez, testified on the basis of petitioner's associations and activities, possession of gang-related items, and photographs depicting gang members and gang-related activities, that petitioner was a member of a Sureño street gang.  While in custody following his arrest for Salazar's murder, petitioner was found to be conducting a roll call of Sureño members inside the jail.

On November 5, 2010, the jury found petitioner and Perez guilty of first degree murder.  Perez was found guilty of participation in a gang.  The jury found that petitioner had personally and intentionally discharged a firearm, causing great bodily injury and death; that a principal personally and intentionally discharged a firearm and caused death; and that the murder was committed for the benefit of a gang.

On December 29, 2010, petitioner was sentenced to a term of 25 years to life for the murder, plus a consecutive term of 25 years to life for the firearms enhancement.

II.     Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on September 25, 2012.  Lodged Doc. 4.  The California Supreme Court denied review on January 3, 2013.  Lodged Doc. 6.  Petitioner did not seek collateral review in state court.

By operation of the prison mailbox rule, the instant federal petition was filed on September 15, 2013.[3]  ECF No. 1.  Respondent answered on January 15, 2014.  ECF No. 15.  Petitioner's traverse was docketed on April 28, 2014.  ECF No. 26.

---

[3] See supra n. 1.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 131 S. Ct. 770, 785 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. at 784-785 (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but circuit law has persuasive value regarding what law is "clearly established" and what constitutes "unreasonable application" of that law. Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044, 1057 (9th Cir. 2004).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

4

the facts of the particular state prisoner's case." Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 1399.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

DISCUSSION

I.    Claim One: Admission Of Custodial Statement Obtained In Violation Of Petitioner's
      Fifth Amendment Right To Remain Silent

A.  Petitioner's Allegations and Pertinent State Court Record

On October 17, 2009, petitioner was interviewed by Detectives Rodriguez and Silva. ACT 13-28.  After confirming petitioner's name, age (18), and address, Rodriguez advised petitioner of his rights.  ACT 14.  Rodriguez questioned petitioner about his family and background, then showed him photographs of other individuals identified in relation to the Salazar shooting, and photos from petitioner's Myspace account showing him with gang members including Perez and Montes.  ACT 14-22.  Rodriguez told petitioner that Perez and Leticia P. were in jail for murder, and encouraged petitioner to provide an explanation for what had happened on the night Salazar was killed:

> . . . Something happened.  You were there with your friends.  And it
> ended up bad.  Okay?  And no matter what I say, it's, it's not gonna
> make it a good situation, because it's gonna stay bad, but unless we

5

> find out exactly what happened, then your friends, your uncle, could be in serious trouble.  Okay?  I'm not, I'm not threatening you, okay?  I'm not making you any promises.  You know?  But what I'm saying is, is that you're old enough to understand is that the best thing we can do here is, is try to explain what happened. . . .  [W]e brought you here right now, you know, to give you an opportunity to explain what happened. . . .

ACT 22.

Rodriguez tried to persuade petitioner to provide his side of the story, repeatedly stating "you gotta say something."  ACT 23:6, 23:15, 23:27.  The third time Rodriguez said this, petitioner said, "You told me I have the right to remain silent, right?"  ACT 24.  Rodriguez answered:

> You do.  That, that's your right.  The only reason we brought you down here and the only reason we want to talk to you is to get your side of it.  So it's up to you.  If you want to explain to us what happened, we'll listen, and if you don't, we'll just go by what the other people say, and that's fine too.  So what do you wanna do?

ACT 24.

Detective Silva followed up:

> Jose, . . . I think it's important that, that you tell us your story and not let other people talk for you. . . .  [I]t's time for you to. . . tell me your story.  So we can get a better picture of what happened that night.  And what's important is to just be honest.  That's what's best.  I mean, we've talked to many, many people sitting in that chair. . . . And this is your opportunity.  It is.  Like my partner said, I mean, you're eighteen, you're young.  We're here to listen and write down what you tell us.  I know inside of you, you have a heart, you have a conscience.  And you gotta do what's right. . . . You just gotta do what's right.  Tell us your story.

ACT 24.

The detectives continued in this vein until petitioner said, "All I know, I didn't have nothing to do with it."  ACT 25.  Petitioner and the detectives went back and forth about why other people would say petitioner was involved if he wasn't.  ACT 25-26.  The detectives confronted petitioner with evidence of his cell phone activity before and after the shooting.  ACT 26.  They told him that other witnesses had said he had fired a gun at Salazar.  ACT 27.  Rodriguez said,

> All, all we want know is, is what was going through your mind.

6

1
2
3
4

> You was flashing it?  Maybe it just accidentally went off?  Or were you pointing it and you just meant to kill him?  I don't know.  I really don't know.  But you gotta say something.  Because they're saying something, and like, and like you said, they're probably just trying to help themselves. . . .  But no one knows what was going through your mind.

5   ACT 27.

6   Silva followed up immediately with the question, "Was is an accident?"  Petitioner

7   answered, "I'm not the shooter, I was just in the car.  And that's all I'm gonna say.  I think I want

8   an attorney."  ACT 27.  Questioning about the shooting then ceased.

9   Petitioner brought a pre-trial motion to suppress his statement, arguing that everything he

10   said after "You told me I have the right to remain silent, right?" was taken in violation of his Fifth

11   Amendment right to remain silent.  4 CT 1037-53.  The trial court held a hearing at which

12   Detective Rodriguez testified, and the judge watched a DVD recording of the interview.  1 RT

13   77-114.  The court found that petitioner had been properly advised of his rights and understood

14   them, that he was not coerced, and that he answered questions freely.  Accordingly, the court

15   found that petitioner had impliedly waived his Miranda rights.  1RT 129-30.  The court found

16   further that petitioner had not unambiguously invoked his right to remain silent.  "I find that Mr.

17   Gutierrez's question posed concerning the right to remain silent was vague, ambiguous, and

18   equivocal."  1 RT 132.  The statement was therefore allowed into evidence.

19   B.  The Clearly Established Federal Law

20   Before a criminal suspect may be subjected to custodial interrogation, he must be advised

21   that "he has the right to remain silent, that anything he says can be used against him in a court of

22   law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney

23   one will be appointed for him prior to any questioning if he so desires."  Miranda v. Arizona, 384

24   U.S. 436, 479 (1966).  When a suspect invokes these rights, questioning must cease.  Miranda,

25   384 U.S. at 474.  The admissibility of statements made after an invocation of the right to silence

26   turns on whether the suspect's right to cut off questioning was scrupulously honored.  Michagan

27   v. Mosley, 423 U.S. 96, 103-104 (1975).  To be effective, however, an invocation must be

28   unequivocal.  Davis v. United States, 512 U.S. 452, 459 (1994) (right to counsel); Berghuis v.

1    Thompkins, 560 U.S. 370, 381-82 (2010) (right to silence).

2              C.   The State Court's Ruling

3         This claim was raised on direct appeal.  Because the California Supreme Court denied

4    discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

5    decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

6    501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

7         The California Court of Appeal ruled in relevant part as follows:

8              The statement here was insufficient to invoke Gutierrez's *Miranda*
              rights.  Statements similar to the one here have been found
9              insufficient, including the following: "'Maybe I should talk to a
              lawyer'" (*Davis v. United States, supra, 512 U.S. at p. 462 [129*
10             *L.Ed.2d at p. 373]*); "'Did you say I could have a lawyer?'" (*People*
              *v. Crittenden (1994) 9 Cal.4th 83, 123, 130-131)*; and "'I think it'd
11             probably be a good idea for me to get an attorney'" (*People v.*
              *Bacon (2010) 50 Cal.4th 1082, 1104)*. More recently, even the
12             statement, "'If you can bring me a lawyer, that way I[,] I with who
              ... that way I can tell you everything that I know and everything that
13             I need to tell you and someone to represent me'" was held by our
              Supreme Court to be an ambiguous invocation of a defendant's
14             *Miranda* rights. (*People v. Sauceda-Contreras (2012) 55 Cal.4th*
              *203, 206-207*.)
15
              Here, it was during the midpoint of the interrogation when the
16             detectives' questions implicated Gutierrez and his friends in the
              shooting that Gutierrez's free-flowing responses slowed down. It
17             was then Gutierrez asked, "You told me I have the right to remain
              silent, right?" His asking whether he had the right to remain silent
18             was equivocal -- it either could be seen simply as the question it
              posed or as a stalling tactic. Either way, the detective confirmed
19             Gutierrez had that right and then let Gutierrez decide whether he
              wanted to go on with the interview. Gutierrez then decided he
20             wanted to do so. Just as in *Stitely,* where the detective confirmed
              with the defendant that talking was optional and alluded to the prior
21             *Miranda* warning (*People v. Stitely, supra, 35 Cal.4th at p. 536*),
              here the detective said the right to remain silent was Gutierrez's
22             right, it was "up to [him]" if he wanted to talk and the detectives
              would listen, and if he did not "that's fine, too." Just as in *Stitely,*
23             nothing in Gutierrez's equivocal statement prevented the detective
              from continuing the interview. There was no *Miranda* violation.
24

25   Lodged Doc. 4 at 6-7.

26             D.   Objective Reasonableness Under § 2254(d)

27        The California court did not unreasonably apply clearly established U.S. Supreme Court

28

1    precedent.  In Davis v. United States, upon which the California Court of Appeal relied in

2    petitioner's case, the statement "Maybe I should talk to a lawyer" was held not to unequivocally

3    assert the right to counsel.  Davis, 512 U.S. at 462.  Accordingly, continued questioning did not

4    violate the defendant's rights and his statements were admissible against him at trial.  Id.  The

5    standard for unequivocal assertion is the same whether the right involved is the right to counsel or

6    the right to silence.  Berghuis, 560 U.S. at 381-81.  The state court's conclusion in this case does

7    not constitute an unreasonable application of Davis, because petitioner's statement ("You told me

8    I have the right to remain silent, right?") is not less equivocal than the statement at issue in Davis.

9    Both statements suggest that the suspect was considering whether he should invoke his rights and

10   refuse to continue the interview, but neither statement actually states an intention to do so.

11        As the Supreme Court has explained, a suspect "must claim [the privilege against self-

12   incrimination] at the time he relies on it."  Salinas v. Texas, 133 S.Ct. 2174, 2179 (2013).  Here as

13   in Berghuis v. Thompkins,

14            [Petitioner] did not say that he wanted to remain silent or that he did
             not want to talk with the police.  Had he made either of these
15           simple, unambiguous statements, he would have invoked his "right
             to cut off questioning." [citations omitted.]  Here he did neither, so
16           he did not invoke his right to remain silent.

17   560 U.S. at 382.

18        This court is not free to independently determine whether the statement ""You told me I

19   have the right to remain silent, right?" should have terminated the interview.  The only question

20   under § 2254(d) is whether the decision of the California Court of Appeal was within the range of

21   reasonable applications of clearly established U.S. Supreme Court precedent.  For the reasons

22   already explained, the state court's decision did not unreasonably apply Davis or Thompkins.

23        This case is distinguishable from Sessoms v. Grounds, 776 F.3d 615 (9th Cir. 2015) (en

24   banc)[4], in which the Ninth Circuit recently held that the state court had unreasonably denied relief

25   on a claim that a petitioner's Miranda rights had been violated.  In Sessoms, police questioning

26   continued after the following exchange between police and the 19 year old suspect:

27

28   _____
     [4]  Cert. pet. filed, No. 14-1398 (May 22, 2015).

> Sessoms: There wouldn't be any possible way that I could have a—
> a lawyer present while we do this?
>
> Det. Woods: Well, uh, what I'll do is, um—
>
> Sessoms: Yeah, that's what my dad asked me to ask you guys . . .
> uh, give me a lawyer.

776 F.3d at 617-18.

The Ninth Circuit held that when Sessoms' statements were considered "together and in context," id. at 625, they unequivocally expressed the desire for a lawyer – and that it was unreasonable of the state court to have concluded otherwise, id. at 629.  The question asked by petitioner in the present case is analogous to the question first asked by Sessoms in the passage quoted above, but it was not followed by an affirmative statement like the one in Sessoms.  It was Sessom's *second* statement, "give me a lawyer," in combination with the preceding question about access to counsel and in context of the interrogation overall, that the court found sufficient to invoke the right to counsel and thus to support habeas relief.  776 F.3d at 625, 626-27.[5]  Had petitioner in the present case followed his question, "You told me I have the right to remain silent, right?" with a statement indicating that this is what he wanted to do, this case would be governed by Sessoms.  Without a statement even remotely analogous to the affirmative "give me a lawyer," however, it falls well outside of Sessom's reach.[6]

Unlike the state court opinion in Sessom, see 776 F.3d at 625, 629, the decision here complied with federal precedent by explicitly analyzing the statement in its larger context and as it would have been understood by a reasonable officer.  See Lodged Doc. 4 at 6-7.  The court noted that:

> [I]t was during the midpoint of the interrogation when the

---

[5]  "Viewed in the context of Sessoms's prior request that the detectives make counsel available to him during the interrogation, it was unreasonable to hold that Sessoms's second statement, 'give me a lawyer,' was an ambiguous request for counsel.  What else could this mean?  I don't want an attorney?  I'm not sure I want an attorney?  My dad wants an attorney?  No, it means what it says in plain English: dad told me to ask you and I am -- 'give me an attorney.'"  Sessoms, 776 F.3d at 627.

[6]  Petitioner's statement is even farther afield from that in Anderson v. Terhune, 516 F.3d 781 (9th Cir. 2008).  In that case, the Ninth Circuit found habeas relief appropriate under § 2254(d) where the petitioner had stated during custodial interrogation, "I plead the Fifth."

detectives' questions implicated Gutierrez and his friends in the shooting that Gutierrez's free-flowing responses slowed down.  It was then Gutierrez asked "You told me I have the right to remain silent, right?"  His asking whether he had the right to remain silent was equivocal -- it either could be seen simply as the question it posed or as a stalling tactic. Either way, the detective confirmed Gutierrez had that right and then let Gutierrez decide whether he wanted to go on with the interview. Gutierrez then decided he wanted to do so.

Lodged Doc. 4 at 6.

These are precisely the factors that must be considered under <u>Sessoms</u>.  It was not unreasonable of the state court to conclude that petitioner's question could be interpreted as either a simple question or a "stalling tactic."  And police response to an arguable equivocal reference to <u>Miranda</u> rights is a critical contextual fact.  In <u>Sessoms</u>, the Ninth Circuit emphasized that "[t]he detectives understood that Sessoms was requesting counsel."  <u>Sessoms</u>, 776 F.3d at 626.  The situation here is much different.  When petitioner asked about his right to remain silent, Detective Rodriguez confirmed that it was his choice whether to talk – and petitioner then said nothing to indicate one way or the other whether he wished to invoke or to waive his right to silence.  The next time petitioner spoke it was not to invoke, it was to deny any involvement in the shooting. ACT at 25.  Only after further questioning, and after providing further answers, did petitioner admit his presence in the car.  ACT 25-27.  This context further distinguishes the present case from <u>Sessoms</u>, and illustrates the reasonableness of the state court's disposition.

Moreover, petitioner's question came in response to the detectives' repeated insistence that "you gotta say something."  While context suggests that the detectives meant "you gotta say something *if you want us to know your side of the story*," the words are – on their face – contrary to petitioner's right to say nothing at all.  It is inconsistent with <u>Miranda</u> for officers to repeatedly tell a suspect in custody, "you gotta say something."  But for petitioner to point out that inconsistency is not the same thing as stating an intention to remain silent.  Detective Rodriguez responded appropriately to petitioner's challenge, clarified the apparent inconsistency, and offered an opportunity for invocation that petitioner failed to take advantage of.

Absent a clear statement of intent to assert the privilege, the state court's rejection of the claim was not objectively unreasonable under <u>Davis</u>, <u>Thompkins</u> and <u>Salinas</u>.  Accordingly, §

11

2254(d) precludes relief on Claim One.

II.      Claim Two: Trial Court's Failure To Instruct Jury That It Could Consider Whether Witness Was Promised Benefit Or Leniency

A.  Petitioner's Allegations and Pertinent State Court Record

When Leticia P. was interviewed by the police on October 16, 2009, she initially hesitated to provide information because she thought she was in trouble.  5 RT 1478.  She did not want to disclose what she knew unless the interrogating officer, Detective Rodriguez, let her know whether or not she was going to jail.  6 RT 1567.  She asked Rodriguez, "If I tell you my story, am I still going to jail?"  He replied, "I'll tell you what, if you don't tell me anything, you're certainly going to go to jail."  6 RT 1567-68.  After Leticia talked to Rodriguez, she did not go to jail.  6 RT 1556.

At trial, Leticia was the only witness to identify petitioner as a participant in the crimes. Her testimony was the only evidence that petitioner had personally shot Salazar.[7]  She also testified that petitioner had been happy and excited afterwards about the Salazar shooting.

In light of Leticia's October 16, 2009 exchange with Detective Rodriguez, petitioner requested that the jury be instructed with the portion of CALCRIM No. 226 stating that in evaluating a witness's testimony, the jury can consider whether "the witness [was] promised immunity or leniency in exchange for his or her testimony."  8 RT 2338-39.  The trial court refused the request, finding no substantial evidence that the witness was promised leniency for her testimony.  8 RT 2339.

The jury was instructed pursuant to CALCRIM No. 226 without reference to the "promise" factor, as follows:

> In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are:

---

[7]  A bus driver who witnessed the incident testified that a man wearing grey pants, who had not initially been involved in the fight (and thus was not Perez or Montes), fired at Salazar over the hood of the car from the driver's side, and then approached firing as Salazar fell to the ground.  3 RT 700-723.  Leticia's testimony provided the basis for a finding that this individual was petitioner.

How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

How well was the witness able to remember and describe what happened?

What was the witness's behavior while testifying?

Did the witness understand the questions and answer them directly?

Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interests in how the case is decided?

What was the witness's attitude about the case or about testifying?

Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

How reasonable is the testimony when you consider all the other evidence in the case?

Did other evidence prove or disprove any fact about which the witness testified?

Did the witness admit to being untruthful?

Has the witness engaged in conduct that reflects on his or her believability?

10 RT 2750-51.

     B.  The Clearly Established Federal Law

Erroneous jury instructions do not support federal habeas relief unless the infirm instruction so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)). See also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]'"). This standard also applies to omitted instructions. Henderson v. Kibbe, 431 U.S. 145, 155 (1977). An omission is less likely to be prejudicial than a misstatement of the law. Id. Due process is implicated only when a defendant fails to receive an instruction to which she is entitled. Hopper v. Evans, 456 U.S. 605, 611 (1982).

     C.  The State Court's Ruling

This claim was raised on direct appeal. Because the California Supreme Court denied

13

discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

decision on the merits and is the subject of habeas review in this court.  See Ylst, 501 U.S. 797;

Ortiz, 704 F.3d at 1034.  The California Court of Appeal ruled in relevant part as follows:

> Gutierrez contends the trial court violated his due process right to present a defense when it refused to instruct the jury that in evaluating a witness's credibility (here, Leticia P.), it could consider whether a witness had been promised a benefit or leniency for her testimony. . . .  Gutierrez is wrong because Leticia P. was not promised a benefit or leniency for her testimony.

> To justify the instruction, there has to be "promised immunity or leniency in exchange for his or her testimony." (CALCRIM No. 226.) Here, the only promise was that if Leticia P. did not tell the detective anything, she would go to jail. This did not mean that if she testified at trial, she would not go the jail. Indeed, the topic of immunity or leniency for her trial testimony was never mentioned. There was simply no promised benefit offered in exchange for Leticia P.'s testimony at trial.

Lodged Doc. 4 at 11-12.

      D.  Objective Reasonableness Under § 2254(d)

      The California court did not unreasonably apply clearly established U.S. Supreme Court

precedent.  First, no U.S. Supreme Court precedent identified by petitioner or by this court's

independent research entitles petitioner to the instruction he seeks.  On direct appeal, petitioner

relied on Matthews v. United States, 485 U.S. 58, 63 (1988), for the broad proposition that a

defendant is entitled to an instruction on any recognized defense.  Lodged Doc. 1 (Appellant's

Opening Brief) at 43, 47.  Matthews, however, was decided as a matter of federal criminal

procedure, not on due process grounds.  Moreover, Matthews's holding is limited to the

circumstances in which a federal defendant is entitled to an entrapment instruction.  485 U.S. at

62.  And Matthews does not require that an instruction be given whenever the defense articulates

a theory to support it – it relies on the familiar rule that instructions should be given when they

are supported by the evidence.  Id. at 63 ("As a general proposition a defendant is entitled to an

instruction as to any recognized defense for which there exists evidence sufficient for a

reasonable jury to find in his favor.") (citations omitted).  Despite petitioner's use of the phrase

"theory of the defense," the instruction he was denied is not an instruction about a defense to

murder liability, it is an instruction on a factor related to witness credibility.  For all these reasons,

14

1    Matthews does not constitute clearly established federal law that governs this claim.

2            Second, the Supreme Court's general due process principles require relief only where the

3    ailing instruction – or here, the absence of the requested instruction – by itself so infected the

4    entire trial that the resulting conviction violates due process.  "The burden on the habeas

5    petitioner is 'especially heavy' where, as here, the alleged error involves the failure to give an

6    instruction." Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting Hendricks v. Vasquez,

7    974 F.2d 1099, 1106 (9th Cir. 1992)).  Petitioner cannot meet his heavy burden.  The defense had

8    a full opportunity to cross-examine and impeach Leticia P.[8]; the jury was aware of her exchange

9    with Rodriguez about going to jail; her credibility was addressed at length in closing arguments;

10   and the witness credibility instructions that were given were adequate to permit jury assessment

11   of her testimony. This record does not support a conclusion that petitioner's trial was rendered

12   fundamentally unfair by instructional error.

13           Moreover, the state court disposed of this claim on state law grounds.  Its holding that the

14   facts did not support the requested instruction under California law is unreviewable here.  See

15   Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (state court's ruling on state law issue binding on

16   federal habeas court).  The failure to give an instruction that state law did not require did not

17   violate due process.  See Spivey v. Rocha, 194 F.3d 971, 976 (9th Cir. 1999) (no due process

18   violation when jury instruction accurately reflected state law).

19           In sum, there is no basis here for a finding that the trial was rendered fundamentally unfair

20   by the court's failure to instruct on a factually unsupported theory of witness impeachment.

21   Petitioner is not entitled to relief on this claim under any standard of review.

22                                          CONCLUSION

23           For all the reasons explained above, the state courts' denial of petitioner's claims was not

24   objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Even without reference to

25   AEDPA standards, petitioner has not established any violation of his constitutional rights.

26   _____
     [8]  Among other things, the jury learned that Leticia was on probation and wearing an ankle
27   bracelet at the time of the shooting, that she had been drinking on the night of the homicide, that
     she was in a gang, that she was romantically interested in petitioner's co-defendant, and that she
28   had not come forward when she knew that the police wanted to talk to her.

1   Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be

2   denied.

3          These findings and recommendations are submitted to the United States District Judge

4   assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

5   after being served with these findings and recommendations, any party may file written

6   objections with the court and serve a copy on all parties.  Such a document should be captioned

7   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

8   he shall also address whether a certificate of appealability should issue and, if so, why and as to

9   which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

10  within fourteen days after service of the objections.  The parties are advised that failure to file

11  objections within the specified time may waive the right to appeal the District Court's order.

12  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13  DATED: September 16, 2015

14                                          _____
                                            ALLISON CLAIRE
15                                          UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28